## Case No. 13,240.

SPEYER v. The MARY BELLE ROBERTS.
EGGERS v. SAME. CHAUNCEY
v. SAME.

[2 Sawy. 1.] [1]

District Court, D. California. Feb. 10, 1871.

SHIPPING—DAMAGE TO GOODS—CARRIER'S FAULT
—PERILS OF SEA.

Where goods arrived in a damaged condition, and it appeared that the damage was in great part caused by the carrier's fault, but that damage, to some extent, would probably have been caused by perils of the sea encountered by the vessel, but to what extent the carrier was unable to show; *held*, that he was liable for the whole.

[Cited in brief in Fleishman v. The John P. Best. Case No. 4,861. Cited in The Shand, 16 Fed. 572; The Tommy, Id. 608.]

[These were libels for injury to goods, by Morris Speyer, George H. Eggers, and H. N. Chauncey against the Mary Belle Roberts.]

Milton Andros, for libellants.
McAllisters & Bergin, for claimant.

HOFFMAN, District Judge. The libels in the above cases, which by consent were tried together, were filed to recover damages for injuries to goods shipped on the above vessel to be transported from Hamburg to this port. The injury to the goods being proved, the carrier offered evidence tending to show that it was occasioned by perils of the sea. The libellant then produced testimony tending to prove as averred in the answer, that the damage was caused: (1) By careless and negligent stowage of the cargo. (2) By the reason of the insufficient and defective condition of the scuppers when the vessel commenced her voyage. (3) By sweat and moisture arising from insufficient ventilation, and the neglect of the master. while at Falmouth, (a port of refuge he had sought to escape a gale during

---

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

which the vessel had made a great deal of water) to remove the hatches or take any measures to dry the cargo, and, also, by his neglect during the voyage from Falmouth. to take off his hatches in order to dry and ventilate the cargo.

The evidence shows beyond controversy, that shortly after leaving Hamburg, the vessel was exposed to sea perils of an unusual character. The severity of the gale, the ugly cross-sea, the straining and leaking of the ship. the long and ineffectual pumping by the crew, and their exhausted condition in consequence, their application to the master to seek a port of refuge, and his final determination to do so. after consultation with the mate, are established by the concurrent testimony of all on board.

It is also, I think, evident that the vessel was well provided, and in a seaworthy condition, when she left Hamburg, with the exception that there was a hole in one of her scuppers. It was strenuously urged at the hearing that, as the scupper, at the place where this hole was found, passed through solid timber, but little water could have reached the cargo, and that, therefore, no considerable part of the damage can be attributed to this defect. And such would seem to be the fact. if the statements of the witnesses, as to the precise position of the hole in the scupper, be accepted.

On the other hand, the master, in his protest, seems to ascribe the greater part of the damage to this very cause. His statement is: "On this day had an examination, found the port scupper had been broken off at some time in the severe weather encountered, and that the sea had free access to the vessel through this scupper."

This statement contains two errors: First. the hole in the scupper was discovered, not after the arrival of the vessel at Falmouth, but some time previously, and during the gale; second, there is no reason to believe that it was made during the gale, or at any time after the departure of the vessel. Its origin was ascribed by the master and officers, either to an injury inflicted while clearing the scupper of ice. or else made by a boat hook in the hands of some lighterman alongside the vessel at Hamburg.

In the view I take of the case, it is not necessary to attempt to determine (if that were possible) how much of the injury to the cargo is to be attributed to this cause. That some of it was due to it, cannot, I think, be denied; but probably no very considerable amount when compared with the total damage.

Some attempt was made to show that the leak under the grub-beam was caused by defective caulking. I think, however, under the proofs, that the straining and working of the ship in the very severe storm she encountered, may be accepted as the cause of this leak.

But the most important allegations of the libel with regard to the stowage of the cargo

and the insufficiency of the dunnage, appear to be clearly established by the proofs.

A large number of witnesses, including the port warden and other experts, concur in the statement that the dunnage to the cargo, especially at the bilges, was wholly insufficient. The master himself seems to admit that the cargo was not stowed as he directed, nor, we may infer, as he considered properly. He states that when the stevedores were stowing the cargo he was down with them as often as he could be—perhaps, one third of the time. That he gave orders to break out cargo when he did not think it was stowed properly—"This happened at least a dozen times, probably many more, my orders were obeyed whilst I was there. I am satisfied from the breaking out of the cargo here that the cargo was stowed back as it originally was. I mean that after I had left the hold they put things back as they were before." I do not deem it necessary to recapitulate the names of the numerous witnesses who confirm the conclusion which would naturally be drawn from these admissions of the master. Some of them do not hesitate to express the opinion that the greater part of the damage was caused by insufficiency of dunnage.

That the effect of a want of dunnage would be to expose the cargo to injury from water running down the sides and also to increase the damage from water which might collect in the hold, was abundantly proved and is obvious without proof. The very object for which dunnage is used is to protect the cargo from injury by being wetted. That the cargo would have sustained, even if properly dunnaged, some injury from the unavoidable effect of sea perils encountered by the vessel, and her consequent leaking, must be admitted. But what would have been the extent of that injury, and how much of the damage is to be attributed to each cause, it is impossible now to ascertain.

The question thus arises: Is the carrier liable to make good the whole damage sustained, when the proofs show that part of it was occasioned by a cause for which he was not responsible, and part was caused by his own negligence, but he is unable to show how much was due to either cause separately? To exonerate a carrier, prima facie, from the liability assumed by him under his bill of lading, it will be sufficient to show that the immediate cause of the injury was a peril of the seas, or other cause for which he is not responsible.

But after this proof has been given, it is competent for the shipper to show that the loss might have been avoided by reasonable skill and diligence, in other words, that the loss would not have occurred except for the carrier's negligence. Clark v. Barnwell, 12 How. [53 U. S.] 280. In such cases it has been held that the inquiry is, did the want of skill of the master and crew contribute in any degree to the loss? And that the carrier must show, not that the loss might have happened if the act complained of had not been done, but that it must have happened.

Thus when the immediate cause of the loss was the sudden and unexpected rising of a river to an unprecedented height, and it appeared that if the goods had been forwarded without unreasonable delay they would not have been exposed to the danger, it was held that this negligence of the carrier rendered him liable for a loss of which the immediate cause was a vis major. In Williams v. Grant, 1 Conn. 487, the court says: "And in cases of this description carriers may be liable for a loss arising from inevitable necessity existing at the time of the loss, if they have been guilty of a previous negligence or misconduct by which the loss may have been occasioned * * * It is a condition precedent to the exoneration of carriers that they should have been in no default, or, in other words, that the goods of the shipper should not have been exposed to the peril, or accident, which occasioned the loss by their own misconduct, negligence, or ignorance. For though the immediate or proximate cause of the loss may have been what is termed act of God, or inevitable accident, yet, if the carrier unnecessarily exposes the property to such accident, by any culpable act or omission of his own, he is not excused. Per Gould, J. It is evident, therefore, that in this case the carrier is liable for all injuries which, though immediately caused by a peril of the sea, would not have occurred had not his own negligence contributed to produce the injurious result. The bad stowage of the cargo was, as to this damage not the causa causans but the causa sine qua non and for the effect of this cause he is liable.

The real difficulty in the case arises from the fact which, however, is not conclusively established, that the cargo would have sustained some damage even if it had been properly stowed; but how much cannot be known. We are thus forced to choose between two alternatives, either to hold the carrier responsible for damages, a part of which he is not accountable for, or else to deny to the shipper any compensation for losses, which, in great part, were caused by the carrier's fault.

The former alternative must, in my opinion, be adopted. By his contract, the carrier promised to deliver the goods in like good order and condition as when received, unless prevented from so doing by one of the excepted perils. The cargo being found to be damaged, the burden of proof was on him to show that the loss was occasioned by one of the causes which, by law and the terms of his contract, afford an excuse for its non-performance. It is not enough that he show that a part of the damage was so caused, while the remainder was caused by his own negligence. To excuse himself for that portion of the loss for which he is not liable, he must show how much that portion is; and, unable to exonerate himself in toto, he should establish the degree and extent of the exoneration to which he is entitled.

If he fails to do this, it seems to me that he must be held responsible for the whole damage.

If these views are correct, it is unnecessary to consider how far the master was in fault by neglecting to open his hatches, and attempt to dry and ventilate the cargo while the ship lay at Falmouth, or during his subsequent voyage.

The master, during the voyage, is undoubtedly bound to take all possible care of the cargo, and "he is responsible," says Mr. Chancellor Kent, "for every injury which might have been prevented by human foresight, and prudence, and competent naval skill." 3 Kent, Comm. p. 213; 1 Pars. Shipp. & Adm. 262; [Clark v. Barnwell] 12 How. [53 U. S.] 280; The Gentleman [Case No. 5,324].

Something must, however, be left to the master's discretion and sound judgment; and, in the present case, the evidence hardly justifies the conclusion that the practice of taking off hatches in fair weather on a voyage from Europe and the Eastern ports is so universal, safe and proper a means of ventilating the cargo, as to make the ship responsible, when it is not done, for all the damage by sweat sustained by the cargo, especially when it is apparent that that damage could have been only partially prevented, and, perhaps, to a very inconsiderable degree by any such precautions. With respect to the duty of taking off the hatches at Falmouth, the case is stronger, but the conclusion arrived at, in regard to the liability for the negligent stowage, renders the decision of the point unnecessary. The damages proved by Morris Speyer are $14,682.56; by Eggers & Co., 1,862.19; by Chauncey & Co., 321.99. It is possible, however, that some of these amounts may be slightly erroneous. If so, I am ready to correct them if the error be pointed out.