## Case No. 12,702.

### The SHAND.

[10 Ben. 294.] [1]

District Court, S. D. New York. Feb.. 1879.

SHIPPING—DAMAGE TO CARGO—PERIL OF THE SEA—NEGLIGENCE—BURDEN OF PROOF—DUTY OF MASTER.

1. A ship took on board at Manila a large quantity of mats of sugar, to be brought to New York, under bills of lading containing the usual exception of perils of the sea. On the voyage she met with heavy weather and sprung a leak so that, after having jettisoned a part of her cargo, she arrived at her dock with ten feet of water in her hold, her crew having become so worn out by labor that after she had passed quarantine a gang of fresh men was sent to her, who were, however, able to control the leak with the ship's pumps. The consignees of the ship at once agreed with the owner of a steam pump and the pump was put on board the ship, and by the next morning the water in the ship had been pumped down as far as the suction pipe of the steam pump reached. which was just about at the bottom of the sugar. During the following day, the pump, which was in charge of an engineer and fireman employed by its owner, was worked at intervals as the water rose high enough to reach the suction pipe. The discharge of the cargo had been commenced and continued during that day. During the following night, none of the ship's officers or crew being on duty, the steam pump stopped working. and the water again flooded the lower hold where the sugar was stowed. The consignees of the sugar filed a libel against the ship, claiming to recover damages for a failure to deliver the sugar in like good order as when received, as she had contracted in the bills of lading to do; and the owners of the ship set up as a defence that the damage was occasioned by peril of the sea. *Held*, that, the leak being shown to have been a peril of the sea. the ship had made out her defence as to the cargo jettisoned, and as to the sugar washed out by the leak and the injury caused by the leak to that which remained. up till the time when the water was first pumped out of the ship by the steam pump.

[Cited in The Sloga, Case No. 12,955; The Chasca. 23 Fed. 160.]

2. The duty of the ship, on arriving at the dock. was to use whatever extraordinary means were accessible to prevent further injury to the cargo; and that the employment of the steam pump was an act of the master, in performance of that duty. and not an act of the master as agent of the cargo in extraordinary peril.

[Cited in The Charles J. Willard, 38 Fed. 762.]

3. The persons working the steam pump were therefore the agents of the ship and not agents of the owners of the cargo.

4. The ship. therefore, was responsible for the proper performance of duty by those in charge of the steam pump.

5. Although the original leak was a peril of the sea. the owners of the cargo, having shown that the leak could have been controlled by the use of means which were available, and that such leak had not been controlled, had made out a case of negligence on the part of the ship.

6. The ship, having failed to give any explanation of the stoppage of the steam pump on the night in question, was liable to the owners of the cargo for all the loss and damage to the cargo which arose from the flooding of the ship on that night.

7. The ship was liable for all the loss of sugar occasioned by the suction pipe being so short that the water must rise on the cargo in order to be within reach of the pump.

In admiralty.

R. D. Benedict, for libellants.

T. E. Stillman and W. A. Butler, for claimants.

CHOATE, District Judge. This is a libel by the Donner & De Castro Sugar Refining Company, the owners of part of the cargo of the ship Shand, against the ship and her owners, to recover damages on account of her failure to deliver her cargo in good order and condition, pursuant to the stipulations of her bills of lading. She shipped at Manila, among other goods, 34,742 mats of sugar, weighing about 2,430,940 pounds, and sailed from that port for New York on the 1st day of August, 1876. The sugar was stowed in the lower hold and properly stowed, and dunnaged. It was shipped under bills of lading which acknowledged its receipt in good order and condition, and stipulated for its delivery in New York in like good order and condition, "all and every the dangers and accidents of the seas and navigation of whatsoever kind excepted." The ship delivered in New York only 31,663 mats weighing about 1,008,865 pounds. As to the 3,079 mats not delivered it appeared that they were jettisoned at sea; and the loss of weight in the mats that were delivered was about 1,206,545 pounds. And for this failure to deliver and this loss of weight the suit is brought. The libel charges "that the said ship and her owners have failed to keep and perform the contracts in said bills of lading contained or to deliver the said sugars in conformity therewith; but on the contrary, by reason of carelessness and negligence on the part of said ship and her owners, and their servants or agents, a large part of said sugars were totally lost and a large portion of the remainder delivered in a damaged condition." The answer alleges that part of the sugar was necessarily jettisoned to save the ship and cargo and the lives of those on board, and that all the sugar which was lost or destroyed or jettisoned or which was not delivered was lost, destroyed or not delivered solely from the causes excepted in the bills of lading. and not from any fault. negligence or carelessness on the part of the ship and her owners, or their servants or agents. The answer further alleges in excuse of the damage to the cargo that the ship sprung a leak on the voyage, by reason of violent storms and stress of weather, and that the damage was the result of this leak.

The proofs are sufficient to show that when the ship left Manila she was tight, staunch and strong. It is true that no evidence is given of any survey or examination made before her sailing, nor of any survey or examination of her hull after her discharge in New York to account for or to show the nature

[1] [Reported by Robert D. Benedict. Esq., and Benj. Lincoln Benedict, Esq.. and here reprinted by permission.]

and position of the leak which she undoubtedly had in her upon her arrival; but the uncontradicted testimony of her master and mate as to her condition, and the fact that she was several months at sea and encountered considerable rough weather before a leak of any importance appeared, and that the leak did appear only after she met with very tempestuous weather, sufficient to account for the injury to a good ship, are clearly proof enough that she was seaworthy at the time of her sailing. The proofs also are sufficient to show that the circumstances of danger under which part of the cargo was jettisoned were such as justified the act, and that it was done under reasonable apprehension on the part of the master that the ship might founder, and for the purpose of checking the leak and for the safety of all concerned. As to that part of the loss, therefore, the defence is clearly made out and the libellants have no claim.

From the time the ship was off Cape Hatteras she encountered very heavy weather and the crew were kept constantly at the pumps, and even after the jettison of part of the cargo the leak continued. On the night of the 25th of December, 1876, she took the pilot, being then about sixty miles S. S. E. of Sandy Hook. She came to anchor at quarantine about midnight of the 26th. Her crew were exhausted with constant working at the pumps. The captain and the pilot had thought it necessary to call to their assistance two tugs to bring her in, and they had done so. From quarantine the master telegraphed to the consignees of the ship, Grinnell, Minturn & Co., of New York, for a fresh gang of men to work the pumps. At 5 o'clock in the morning of the 27th and again at 8½ o'clock, the pumps were sounded. At the first sounding they found nearly nine feet of water, and at the second sounding within an inch of ten feet. The depth of the hold from the platform on which the sugar was stowed, to the deck beams, was eleven feet and seven inches, and from the bottom to the platform, three feet and four inches. The ship left quarantine about noon on the 27th, and soon after leaving, took on board a fresh gang of men to work the pumps, and from the time they arrived they were able to control the leak with the ship's pumps. She arrived at Martin's stores shortly after noon of the 27th of December, with ten feet of water in her hold. There is considerable conflict of testimony as to the amount of water in the ship before her arrival at quarantine. The pilot, testifying from his recollection as to the behavior of the ship, and from his apprehensions lest she should founder, and also from his recollection as to the reports of the soundings, makes the depth of water eleven feet on the afternoon of the 26th, and six feet at five in the morning of that day; but he is evidently mistaken as to the amount, as appears by the log and the testimony of the master and mate. The captain testified to the correctness of the entry in his log, which shows that on Wednesday, the 27th of December, they sounded and found six feet four inches. He says this was very early in the morning and that there was no time before that when they had so much water in her as that. The evidence shows that the water had been gaining in consequence of the exhaustion of the crew, till it reached a maximum of about ten feet, and that the leak was such that fresh men at the ship's pumps were able to hold it in check.

That a very considerable damage to the cargo of sugar had been done by sea water at the time of the ship's arrival at the pier is very evident. A large part of the sugar had been submerged in the water for nearly twenty-four hours, and this must have resulted in great wastage of the sugar. It is claimed by the libellants that the evidence does not warrant the conclusion that before Wednesday the water ever rose higher than the bottom of the cargo. But even that quantity of water, with the ship rolling and tossing in a heavy sea, must have very seriously wet and washed the sugar in the lower part of the ship. As soon as possible after her arrival at the pier, the consignees of the ship, upon the master's report and application for aid, engaged the Coast Wrecking Company to send a steam pump, with sufficient men to work it, to the ship. This was done, and about eight or nine in the evening, the steam pump was got to work and worked continuously till three o'clock the next morning, when the pump sucked, having reduced the water to three feet and four inches, which was as low as its suction pipe reached. After the steam pump was got working the ship's pumps were stopped.

For all the loss and damage to the cargo by the salt water up to the time that the ship was thus pumped out by the steam pump, the libellants have no claim against the ship and her owners. The cause of the injury was a peril of the sea, and upon the most rigorous rule of diligence which has ever been enforced against the ship or the master in the effort to resist and overcome the effect of the threatened danger, this ship and her master and crew had up to that time discharged their entire duty to the cargo. They had used their utmost endeavors to protect the cargo from the threatened peril.

The discharge of the cargo was commenced on Wednesday. Manila hemp and indigo and canes from between decks, shipped to other parties, were first discharged. The stevedores worked all Wednesday night. On Thursday the steam pump was kept going at intervals, pumping till it sucked and then pumping again as the water rose. On Thursday a considerable quantity of sugar was discharged. They worked till five or six o'clock in the evening. A special permit had been obtained from the custom house, allowing the discharge of this cargo more rapidly than is usual on account of its condition. The cus-

tom house interposed no restriction whatever on the rapidity of the discharge or its continuing day and night, week days and Sundays. When the men quit work on Thursday evening, there were on board, of the ship's company, the captain, the mate, the second mate, carpenter, cook, steward, one able seaman and three boys. The evidence shows, I think, that the mate afterwards left the ship to sleep on shore and did not return before four o'clock Friday morning. A night watchman came on board during the evening, but whether he remained on board all night did not appear. The steam pump was in charge of an engineer named Johnson, and other men, how many does not appear. The captain turned in between eight and nine o'clock and none of the ship's company remained on deck. During the night the steam pump stopped. It failed to keep the ship clear. The cause of the failure does not appear. The weather was very cold but there is no evidence which justifies the conclusion that it was the cold that disabled the pump, or indeed that anything disabled it. There is proof of a conversation in the morning between the engineer and the mate, in which the engineer complained that it was out of order. The evidence is that it was a good and suitable pump, and that the men who were manning it were men who had experience in that work. In the morning it was found that it had failed to keep the ship clear. The lower hold where the sugar was stowed was flooded. The water had risen higher among the mats of sugar than it had ever been before. See The Shand, 4 Fed. 925. Neither the engineer nor the men in charge of the pump, nor the watchman were called as witnesses, and no attempt has been made to explain why or how the accident happened. No alarm was given during the night. The captain was not called nor notified that the pumping had stopped. After the discovery was made in the morning, the steam pump was started again and the ship was pumped out and thereafter kept pumped out as before. For the loss caused by this flooding on the night of the 28th of December, the libellants claim damages. That there was a very large wastage of the sugar from this cause, which is not to be attributed to the effect of the water in her before she was first pumped out, is very evident. The claimants, however, insist that this loss and damage as well as the other is to be attributed to the same peril of the sea: that it was caused by the leak in the ship, which was a continuing peril of the sea: and they claim as to this particular part of the loss that the same having been caused by a peril of the sea, the burden is on the libellants to show that the ship has been guilty of negligence in not guarding against the peril; that such negligence has not been shown; on the contrary, that it is affirmatively shown that the master did all that could have been reasonably required of him under the circumstances of the case; that he employed proper and efficient means to keep the ship clear of water; that having done that, he was not chargeable with negligence if those means became ineffectual through the fault or negligence of those in charge of the steam pump. It is further claimed on the part of the owners of the ship, that the master in employing the steam pump was not acting merely as the agent of the ship, but in a case of necessity and distress as agent for all concerned, cargo as well as ship, and that being the agent of the libellants in thus employing the pump and those in charge of it, they cannot recover of the ship for a loss resulting from the negligence of the libellants' own agents. It is further claimed that the Coast Wrecking Company in this service acted as salvors; that ship and cargo were in imminent peril, and that the service rendered by the Coast Wrecking Company was in fact a salvage service and if through the negligence of the salvors a loss happens to the cargo, its owners have no remedy against the ship.

Assuming that the leak in this ship was caused by a peril of the sea and that this loss now in question resulted from the same leak, the question is, what is the duty of the ship in protecting the cargo against a peril of the sea which threatens its safety, or, which is the same thing, against damage, which threatens to result from an injury to the ship caused by a peril of the sea. The duty of the ship to the owner of the cargo, in this respect, has been so conclusively determined in this country that it is necessary only to quote the language of the supreme court in the case of The Niagara v. Cordes, 21 How. [62 U. S.] 7. In that case the court say (page 26): "Carriers by water are liable at common law and independent of any statutory provision for losses arising from the acts or negligence of others, to the same extent and upon the same principles as carriers by land—that is to say, they are in the nature of insurers and are liable, as before remarked, in all events and for any loss however sustained, unless it happen from the act of God, or the public enemy, or by the act of the shipper or from some other cause or accident, expressly excepted in the bill of lading. Duties remain to be performed by the owner or the master as the agent of the owner after the vessel is wrecked or disabled, and after he has ascertained that he can neither procure another vessel nor repair his own, and those too of a very important character, arising immediately out of his original undertaking to carry the goods safely to their place of destination. His obligation to take all possible care of the goods still continues and is by no means discharged or lessened, while it appears that the goods have not perished with the wreck and certainly not where, as in this case, the vessel is only stranded on the beach. Such disasters are of frequent occurrence along the sea coast in certain seasons of the year, as well

as on the lakes, and it cannot for a moment be admitted that the duties and liabilities of a carrier or master are varied or in any manner lessened by the happening of such an event. Safe custody is as much the duty of a carrier as conveyance and delivery, and when he is unable to carry the goods forward to their place of destination, from causes which he did not produce and over which he has no control, as by the stranding of the vessel, he is still bound by the original obligation to take all possible care of the goods, and is responsible for every loss or injury which might have been prevented by human foresight, skill and prudence. An effort was made by able counsel in King v. Shepherd [Case No. 7,804], to maintain the proposition assumed by the respondents in this case that the duties of a carrier after the ship was wrecked or stranded, were varied, and therefore that he was exempted from all liability, except for reasonable diligence and care in his endeavors to save the property. Judge Story refused to sanction the doctrine and held that his obligations, liabilities and duties as a common carrier still continued, and that he was bound to show that no human diligence, skill or care, could save the property from being lost by the disaster. Anything short of that requirement would be inconsistent with the nature of the original undertaking and the meaning of the contract, as universally understood in courts of justice. Admit the proposition, and it is no longer true that where there is no provision in the contract of affreightment, varying the liability of the carrier, he cannot relieve himself from liability for injuries to goods entrusted to his care except by proving that it was the result of some natural and inevitable necessity, superior to all human agency, or of a force exerted by a public enemy." The contract of carriage in the present case, by the bill of lading, is an absolute promise to carry and deliver in good order and condition, the perils of the seas only excepted, and no distinction can be made nor do the learned counsel for the claimants attempt any between this case and the case of a common carrier, as respects the duty of the ship or master to protect and preserve the cargo. And indeed the evidence shows that the Shand was on this voyage a general ship. And clearly if the duty of the ship in this respect is not varied nor lessened in case the vessel is wrecked or stranded, it cannot be varied or lessened because she has sprung a leak which threatens the cargo with damage. And on this subject the supreme court further says (page 28): "His duties as carrier are not ended until the goods are delivered at their place of destination or are returned to the possession of the shipper or kept safely until the shipper can resume their possession, or they are otherwise disposed of according to law. King v. Shepherd [supra]; Abb. Shipp. (8th Ed.) 478. These authorities are sufficient, it is believed, to demonstrate

the proposition that where a loss or damage is shown it is incumbent upon the carrier to bring it within the excepted peril in order to discharge himself from responsibility. It is not sufficient without more to show that the vessel was stranded, to bring the goods within the exception set up in the case. Had the goods perished with the wreck, it would be clear that the loss was the immediate consequence of the stranding of the vessel, and assuming that the disaster to the vessel was the result of the excepted peril, or of some natural and inevitable accident, then the carrier would be discharged. All the evidence in this case, however, shows the facts to be otherwise—that the goods did not perish at the time the steamer was stranded, and the damage having since occurred, the rule of law to be ascertained is the one applicable in cases where the injury complained of arises subsequently to the disaster to the vessel. Such interruptions to a voyage are of frequent occurrence, and the rule of law is just and reasonable which holds that the master is bound to the utmost exertions in his power to save the goods from the impending peril, as it is no more than a prudent man would do, under like circumstances. In great dangers great care is the ordinary care of prudent men, and in great emergencies prudent men employ their best exertions, so that the difference in the rule contended for and the one here laid down is much less than at first appears. Nevertheless there is a difference, and in a question of so much practical importance it is necessary to adhere strictly to the correct rule. Losses arising from the dangers of navigation within the meaning of the exception set up in this case are not such as are in any degree produced from the intervention of man. They are such as happen in spite of human exertion, and which cannot be prevented by human skill and prudence. When such efforts fail to save the goods from the excepted peril, the ultimate damage and loss in judgment of law results from the first cause, upon the ground that when human exertions are insufficient to ward off the consequences, the excepted peril may be regarded as continuing its operation." And in that case, by the application of the principles thus declared, the ship was held liable for the negligence of the master in not availing himself of the means shown to have been within his reach at a short distance from the ship on the shore for the storage and preservation of the goods, although they ultimately perished from being left in the stranded vessel. In the case of King v. Shepherd [Case No. 7,804], the owners of the ship were held liable to the shipper of specie embezzled by salvors employed by the master to save the cargo after the wreck of the ship, such a loss being held not within the exception of perils of the sea. Judge Story says: "My own opinion is, that the loss of this coin was occasioned solely by embezzlement or theft;

and it matters not whether it was by the officers or crew of the ship, or by the salvors employed by the master."

These cases, as it seems to me, are singularly applicable to the present case, and are conclusive to the point that the master was bound by the contract of affreightment, upon the happening of the disaster which befell his ship, the springing of the leak, to employ all possible means within his reach to protect the goods against the danger which the leak threatened them with,—that he was bound under his original agreement for the safe carriage and delivery of the goods, not only to employ all the resources of his ship's company to this end, but on his arrival in port, where other and more efficient aid could be procured, to employ such other means for the effectual preservation of the cargo against the consequences that might be expected to result to it from the leak; that though that leak was caused by a peril of the sea, this employment of extraordinary means to resist and control it was a duty of the master as agent and representative of the owners of the ship under their contract with the owners of the cargo, and not a duty thrust upon the master ex necessitate, as agent for the owners of the cargo. In the case of The Niagara [Case No. 10.219], the stranded condition of the vessel was a continuing peril to the cargo and was itself caused by a peril of the sea, yet the loss of the goods was not caused by the peril of the sea within the meaning of the exception, because the master could, by means at his command, extraordinary in their character, that is, means independent of and outside of the resources of his ship and his ship's company, have saved the goods from this threatened peril. So here the leak threatened damage to the goods. The master had means at hand by the employment of men and machinery to control that leak. He was bound to employ those men and that machinery, and the fact, if it be a fact, that the peril of the ship and cargo was so great that the service rendered will, on grounds of public policy, be rewarded at salvage rates of compensation, does not make the employment of these means any the less an act done by the master in the performance of the contract of the ship with the owners of the cargo. I think these authorities are sufficient to show that there is no ground for the claim that the men working the steam pump were not in the employ of the ship, or that the possible claim of the Coast Wrecking Company for salvage compensation can make any difference in the liability of the ship for the negligence of the men employed in working the pump as well as for the immediate negligence of the master, officers or crew. A ship is liable for the result of negligence, though the negligence be that of one of the crew, as in case the fault is that of the lookout. If there may be cases where the overpowering necessity for

assistance is such that the master may surrender to salvors the entire control of ship and cargo, that certainly was not this case. His duty was plain. The vessel was leaking. Salt water would damage the cargo. It was his duty to keep her pumped out. The means at hand were ample. He employed men and machinery for this purpose. There is nothing in the evidence which warrants the conclusion that he in fact surrendered the care or control of the ship to the Coast Wrecking Company, or understood that he did, nor were the circumstances such as would have justified him in doing so, if he so intended. On the contrary, all that is proved is that the ship's agents hired of that company a pump and men to run it, and sent it to the ship. The pump and the men were subject to the master's orders. He could at any time have sent them away and employed other persons and other machinery, to do the pumping. I see no principle upon which the ship can' be relieved from responsibility for the negligence of the persons thus employed.

As Judge Story says, in King v. Shepherd [supra]: "The rules which regulate losses under policies of insurance are by no means the same as those which either necessarily or ordinarily govern in cases of common carriers. Each contract has its own peculiarities and principles of interpretation; and it is not safe, in many instances, to reason from one to the other." So it may be said that although by the principles of general average or of salvage, extraordinary expenses incurred by the master are, under certain circumstances, a charge in part upon the cargo, it cannot be safely concluded from that circumstance that as between the master and the owner of the cargo the incurring of the expense was not the duty of the master by force of the bill of lading. General average and salvage contribution rest not on contract, but on reasons of public policy, adopted and enforced for the furtherance of the interests of commerce. The foregoing remarks dispose of the point made for the claimants, that an extraordinary exigency had arisen which threw on the master ex necessitate the character of agent of the shipper, and that in the employment of the steam pump he was acting as such agent, in support of which the learned counsel cite the case of The Gratitudine [3 C. Rob. Adm. 240–267] and other cases. The cases cited refer to the agency of the master thus created to do something with the cargo outside of that which he is already authorized to do with it by the contract of affreightment, as for instance, to sell or hypothecate it. Those authorities are not in point to show that the master is ever made the agent of the owner of the cargo to preserve and protect it. Such preservation and protection are of the very substance of the ship's contract, with the cargo owner, and therefore what the master does in that regard is done for the

ship and there is no necessity for creating by a legal fiction any new agency to authorize or require him to do this duty towards the cargo. It is obvious, therefore, that these authorities have no application to the present case.

The English cases cited show that the courts in England do not hold the ship to so strict a liability as our courts for preventing damage to the cargo from the effect of a threatened peril of the sea. In the recent case of Nugent v. Smith, 1 C. P. Div. 423, it was held that the loss or damage is caused by a peril of the sea if "by no reasonable precaution under the circumstances could it have been prevented." And singularly enough the court cites the authority of Judge Story, in support of this milder rule of liability and in opposition to the stricter rule, which, as appears above, has been adopted by our own supreme court, partly, at least, on Judge Story's authority. They quote Story, Bailm. p. 512, as follows: "Hence it is, if the loss occurs by a peril of the sea, which might have been avoided by the exercise of any reasonable skill or diligence at the time when it occurred, it is not deemed to be in the sense of the phrase such a loss by the perils of the sea as will exempt the carrier from liability, but rather a loss by the gross negligence of the party." And the court go on to say: "Story here speaks only of 'ordinary exertion of human skill and prudence and the exercise of reasonable skill and diligence.' In my opinion this is the true view of the matter, and what Story here says of perils of the sea applies, I think, equally to the perils of the sea coming within the designation of 'acts of God.' In other words, all that can be required of the carrier is that he shall do all that is reasonably and practically possible to ensure the safety of the goods. If he uses all the known means to which prudent and experienced carriers ordinarily have recourse, he does all that can be reasonably required of him, and if, under such circumstances, he is overpowered by a storm or other natural agency, he is within the rule which gives immunity to the effects of such vis major, as the act of God." The language here cited from Judge Story is almost identical with that used by him in his decision of the case of The Reeside [Case No. 11,657]. And the court seems not to have observed his more full and exact exposition of what he understood to be the law in this respect contained in the later case of King v. Shepherd, cited above.

But even under the English rule, it was clearly the duty of the master to keep this ship pumped out, for the preservation of the cargo, and no case is referred to which will relieve the owners of the ship from the consequences of not keeping her pumped out, if the failure to do so was the result of the negligence of those employed by the ship for that purpose. And to hold otherwise would virtually allow the master of the ship in any exigency or condition of distress, however slight, to delegate to other parties those duties which, under the contract, the ship has assumed towards the owner of the cargo, holding him only to due diligence in the choice of the agency so employed. This would be fatal to that security which the law merchant has thrown around the goods entrusted entirely to the care and custody of the ship, and to that rule of vigilance which the law, for wise reasons of public policy, has imposed upon the master and crew as the chief support of that security. It would, as it seems to me, be not only without sanction from authority, but most disastrous to the interests of commerce.

The questions raised as to the burden of proof and as to whether the libellants have sustained the burden which is upon them, are very easily disposed of, so far as this case is concerned. Where goods are carried under a bill of lading which stipulates for their delivery in good order and condition, excepting certain perils, as the perils of the sea or the act of God, proof of the failure to deliver the goods in good order throws the burden on the ship-owner to show that the damage resulted from the excepted peril. Clark v. Barnwell, 12 How. [53 U. S.] 280. If, then, it appears by the proofs offered that the damage resulted from a sea peril, this is prima facie sufficient to bring the case within the exception. Id.; Transportation Co. v. Downer, 11 Wall. [78 U. S.] 134. Therefore, where the evidence which shows that the damage resulted from a sea peril does not also show that there were available to the master means of avoiding the damage which threatened the goods, then the libellant must go further and show that though the goods perished as the result of the excepted peril, yet that there were means within reach of the master by which he could have averted the peril. Negligence is not presumed from the mere occurrence of an accident, "except where the accident proceeds from an act of such a character, that when due care is taken in its performance no injury ordinarily ensues from it in similar cases, or (except) where it is caused by the mismanagement or misconstruction of a thing over which the defendant has immediate control and for the management and construction of which he is responsible." Transportation Co. v. Downer, 11 Wall. [78 U. S.] 134. But there is no case which goes so far as to hold that because the goods were damaged in consequence of a sea peril any greater burden is thrown on the libellant than to show that the master had at his command the means to have averted the threatened danger. The proof of that and the further admitted or proved circumstance, that the danger was not averted, is evidence from which the presumption of negligence in the use of those means at once arises. It is, unexplained, sufficient proof of negligence. The presumption is of the same

general character as that presumption of negligence which arises in the first instance upon proof of the failure to deliver the goods in an undamaged condition. The cases relied on by claimants to sustain their position that the libellants should have gone further and affirmatively proved that the pump failed through the negligence of the engineer or those in charge of it, are not in point. They are cases where the loss was shown to be ultimately traceable to a peril of the sea and where the evidence disclosed no available means on the part of the ship to have averted the danger to the goods. Now in the present case it appears that the means at the master's command were ample. The ship's pumps were sufficient for that purpose, if properly manned. He undoubtedly had a right to use the steam pump in place of the ship's pumps if he chose to do so, but having employed this new agency he was bound by the same rule of vigilance that governed his whole conduct toward the cargo, to see to it that the pump was efficient and properly used. There certainly is no presumption that the stoppage of the steam pump was caused by an inevitable accident. And the failure to call the engineer or others in charge of it, to explain the fact, is fatal to the supposition. It must be assumed that their testimony would not aid the claimants. But if the steam pump did break down, the duty of the master was equally plain to put the ship's pumps at work at once. His ship's company, reduced as it was, consisted of ten men and boys, and the men in charge of the steam pump were at his service. The danger could thus have been wholly or partially averted until further help could be obtained. Thus the libellants have clearly made out a case of negligence in the failure to keep the ship pumped out, and for all damage to the cargo resulting from the ship being flooded on the night of the 28th of December they are entitled to recover.

A further claim is made by the libellants for damage to the cargo by the exposure of the bottom of the sugar to the water, in consequence of the suction pipe of the steam pump not reaching lower than the platform. All the time that the ship was discharging and while the steam pump was at work the water was necessarily allowed to rise somewhat above the point reached by this pump to enable the pump to work. Upon the proofs, I think it appears that some small part of the lower portion of the sugar was thus constantly being alternately submerged and drained of water. This process necessarily carried off more or less of the sugar, and for this damage the ship is clearly responsible. No excuse or reason is shown or suggested why the pipe was not lengthened or why the ship's pumps, which reached this water, were not employed to pump it out, if there was any difficulty or necessary delay in properly adjusting the steam pump. The claimants insist that the loss attributable to this cause is too trifling to be charged against the ship, but the negligence being entirely clear the amount of the damage is not material. Whatever loss ensued from this cause the ship is liable for.

A further claim of damage is made in consequence of delay in delivering the cargo. The delivery stopped at some time on Saturday, December 30th, and was not resumed until Wednesday, January 3d. The cause of the stoppage was that the ship became crank, and the ballast which the consignees of the ship had intended to put on board for the outward voyage was not at hand on Saturday, and owing to the intervention of Sunday and New Year's day and the severity of the weather, the ballast was not got to the ship till Tuesday afternoon, although when it was discovered that the ship was getting crank some efforts were made to hurry it up. The effect of the delay was to increase to some extent the necessary loss by drainage of this mass of wet sugar. That the ship owner owes some duty to the owner of the cargo in the preservation from further loss of goods already damaged by a sea peril is unquestionable. Notara v. Henderson, L. R. 7 Q. B. 225. There is nothing unlawful or in the view of the maritime law improper in the delivery of cargo on Sunday or festival days, especially where such delivery is necessary to avert loss. Richardson v. Goddard, 23 How. [64 U. S.] 28. And although a carrier seems not to be held generally to more than reasonable diligence as respects the time of delivery (Briddon v. Great Northern Ry. Co., 28 L. J. Exch. 51), yet it seems but reasonable that the delivery should be continued on Sundays and holidays if thereby any considerable damage to the goods would be averted. But where the owner of the goods is at hand and knows the circumstances and no request to do this is made, it may be doubted if the ship is chargeable with negligence from this cause. It seems, however, unnecessary at this stage of the case to determine these questions, or the further question whether there was fault in not having the ballast at the ship on Saturday, because so far as the loss which resulted from the flooding of the ship on Thursday night was aggravated by any delay in delivery, the ship is liable for that additional loss as a part of the loss caused by the flooding, and it does not distinctly appear that the loss necessarily resulting from the original wetting of the cargo was appreciably enhanced by the slowness of the delivery. Therefore, any such question of liability may well be left till the report of the commissioner as to the amount of the damage shall disclose the fact that the question really arises.

Decree for libellants and reference to compute damages.

[NOTE. The claimants desired to introduce evidence before the commissioner to whom the case was referred, pursuant to the above de-

cree, tending to show that the water did not rise so high on the morning of the 29th as it had been previously, and an application was made to the district court for a reconsideration of this finding of fact, and to ascertain whether this question was open upon the reference. The court decided that this question was immaterial. 4 Fed. 925.

[The commissioner assessed damages at $30,-328.63. For a hearing on exceptions to this report, see 16 Fed. 570.]