### The Tommy, etc.

*(District Court, S. D. New York. May 1, 1883.)*

1. BILL OF LADING CONSTRUED.

Where a bill of lading recites the receipt of goods in good order, and has a clause at the close, "Not accountable for weight, contents, packing, marks, and *damage*," *held*, the word "damage" has reference to damage of the goods at the time of their receipt, and not to injuries to them arising subsequently on the voyage.

2. DAMAGE TO CARGO—FAULTY CONSTRUCTION OF BIN—LIABILITY.

Where a cargo of old iron was stowed on the bark T., in a trunk or bin made of boards, running along the center of the ship, with bales of rags on each side, and the bin between decks extended several feet higher than the adjoining bales, and during a long and rough passage the bin was broken down and the iron scattered over the bales, tearing them open, and the rust from the iron also sifting down upon the bales below, *held*, upon the evidence, that the bin was not securely constructed, and the vessel was liable for the damage done to the rags by the iron and rust.

3. SAME—CONTACT WITH SEA-WATER.

Where bales in the lower hold were injured by sea-water and rotting, and it appeared that dunnage of fire-wood along the sides had to a considerable extent fallen down, and no evidence appearing of its being fastened to prevent falling, *held*, the vessel was liable for the contact with sea-water from this cause. *Held, also*, that the vessel was not liable for injuries from sea-water taken in through the water-way seams upon a long and tempestuous voyage.

In Admiralty.

*Carpenter & Hays* and *R. D. Benedict*, for libelants.

*Jas. K. Hill, Wing & Shoudy*, for claimant.

BROWN, J. The libel in this case was filed to recover the sum of $3,700 damages to 178 bales of linen rags, part of a consignment of 347 bales from Warsaw, Poland, which were shipped at Danzig on the bark Tommy, and brought thence to New York, arriving on the second of May, 1880. The testimony of the captain and mate and stevedore leaves no doubt that the rags were, on the whole, received on board dry and in good condition, although a few of the bales at that time required additional strapping, which was done by the captain's direction.

The Tommy was a bark of 394 tons measurement, and of about 500 tons burden. The lower hold was stowed with 148 tons of old iron rails. Above these was stowed some scrap-iron, upon which was one tier of bales of the rags. The beams above were open. A temporary flooring was laid of plank, fastened together by cross-cleats riveted to the planks above and below. Upon this temporary flooring a trunk or bin was constructed about eight feet in width, running fore and aft along the middle of the ship, in which the rest of the scrap-iron was placed, and which, according to the captain's testimony, reached to the upper deck beams. On each side of this trunk or bin the rest of the bales of rags were stowed, but did not reach, as the captain testifies, within three or four feet of the upper beams. The scrap-iron thus stowed amounted altogether to 239 tons. In the forward part of the ship, but not in contact with the iron, were 61 other bales of rags for other consignees; and this, with the iron, comprised the entire cargo, amounting to about 507 tons.

The vessel left Danzig on December 19, 1879, but meeting with heavy weather, cold, and ice, she put into Elsinore roads on January 11th, and on January 17th was towed into Elsinore harbor, where, on account of the floating ice, she remained until February 12th, when she sailed for New York, and after a voyage of 79 days arrived there on the second of May, 1880.

An ordinary passage is about 45 days. Her log shows a constant succession of stormy weather after leaving Elsinore, and evidently a rough and trying voyage. Some 20 or 30 feet of her bulwarks were carried away on her port side, a number of her stanchions and her water-way seams more or less opened, from which she took in some water. Her injuries, however, do not seem to have been serious; the necessary repair was completed in from eight to ten days. She does

not appear by her log at any time during the voyage to have had more than 11 inches of water in her pumps. Generally, when pumped, she seemed to have been pumped clear without difficulty; and when, through heavy rolling in March and April, her pumps would not work for a week or more together, there was very little accumulation of water in her hold, as her log shows she was easily "pumped dry" as soon as smoother weather prevailed. *Hubert* v. *Recknagel*, 13 FED. REP. 912. When her hatches were opened for unloading, the scrap-iron was found scattered over the tops of the bales of rags, and no indications of a trunk or bin were visible. The 61 bales stowed forward on top were damaged by sea-water. Of the 347 bales consigned to the libelants, only 169 came out whole. The remaining 178 bales, the subject of this suit, were either wholly or partly broken loose and damaged; some being in half or quarter bales, and the rest in a loose mass, and all damaged through sea-water, rot, or rust. Such as were fit were rebaled in their damaged condition, and were removed and sold as a damaged lot; the rest, filthy, rotten, and worthless, were thrown away.

The respondents contend that the cargo was properly dunnaged, and properly arranged and secured, and that the damage is to be ascribed solely to the extraordinarily rough weather and the length of the voyage.

The bill of lading recites that the bales were received in good order and condition. At its close, however, is a clause in writing stating, "Not accountable for weight, contents, packing, marks, and damages." Without claiming that the clause last named would exempt the vessel from the consequences of proved negligence, it is contended by the respondents that this clause does at least throw the burden of proof upon the libelants to show that the damage to the rags was caused by some positive acts of negligence on the part of the bark, (*Vaughan* v. *Six Hundred and Thirty Casks Sherry Wine*, 7 Ben. 506; 14 Blatchf. 517; *The Pereire*, 8 Ben. 301; *The Invincible*, 1 Low. 226;) and that the ordinary rule by which it is sufficient for the consignee in the first instance to show that the goods are not delivered in the same good order and condition in which they were received on board, (*Clark* v. *Barnwell*, 12 How. 272; *The T. A. Goddard*, 12 FED. REP. 174, 177,) does not apply under this clause in the bill of lading.

The libelants claim that the context in the clause referred to shows that the word "damage," like the words "marks, contents, weights,"

etc., refers only to the condition of the goods at the time they were received on board. The connection in which this word is used affords some ground for this interpretation, which is strengthened by the consideration of the unusual and unreasonable character of this clause, if considered as a stipulation against any liability for future damage by the ship's own negligence, and the improbability of any such intention. As respects its effect upon the burden of proof, I do not deem it material, inasmuch as the facts proved seem to me to show such negligence on the part of the vessel as makes her liable for at least a portion of this damage. The injury to the bales appears from the evidence to have arisen from several causes: (1) From the scrap-iron being either loaded directly upon the bales in the first instance, or, if at first confined in a trunk or bin, from its breaking loose and becoming scattered over the bales, and during the rolling and pitching of the ship tearing the bales loose; (2) from iron rust sifting down through and among the bales and their contents; (3) damage from the sea-water along the sides of the vessel where the bales came in contact with the sides of the ship, either throug hinsufficient dunnage or from the dunnage falling down; (4) from sea-water coming through the water-way seams upon the bales beneath.

For so much of the damage as came from the last-mentioned cause the respondents have, I think, sufficiently shown that the ship is not responsible, and that it arose from the perils of the sea during her long and tempestuous voyage. *The Burswell*, 13 Fed. Rep. 904.

The other three causes of injury are such as, in my judgment, the ship was bound to guard against, but which she did not prevent through negligence in insufficiently securing the dunnage and the trunk or bin containing the scrap-iron.

On the part of the libelants it was contended that the arrangements whereby the scrap-iron was stowed in a central bin with bales along-side in the wings, and also over the bales in the hold, was, in itself, faulty and improper, through the liability of rust to sift through, and of the iron in the bins to break loose. Several witnesses for the libelants testified to this fact, while others for the respondents testified that it was a proper arrangement, and one or two even state that it was proper even if the bin was unfastened. For the proper trim and to prevent too great stiffness in the bark, it was probably necessary in this case that a portion of the iron should be stowed between-decks. This might doubtless have been done with equal safety to the ship, and with greater safety to the rags, by constructing bulk-

heads athwart-ships, and making separate compartments in which the iron and the rags should be stowed, and, if no other mode could have secured the rags against injury from the iron, it would have been the legal duty of the vessel to adopt 'that or bear all the consequences of neglecting it. *Mainwaring* v. *The Carric Delap*, 1 FED. REP. 874. I do not think, however, that it was indispensable to resort to that mode of stowage. The evidence shows that it was not uncommon to stow rags and iron according to the arrangement adopted in this case; but in doing so it was clearly incumbent on the respondents to take all necessary measures to keep the scrap-iron from breaking loose and getting scattered over the bales, as well as to prevent the rust sifting among the bales beneath. To prevent the latter, where the beams between-decks were open, as in this vessel, would have been easy by the use of some covering, as of canvas, mats, or other material placed over the bales below or beneath the temporary flooring. The liability to injury from the sifting of rust or falling of pieces of the iron down among the bales was well known. It was testified to by several of the respondent's witnesses; it was admitted by the master; and it was a danger against which the vessel was therefore bound to provide, either through an arrangement of the cargo which completely separated the rags from the iron, or else through a sufficient covering as a protection.

The trunk or bin in which the scrap-iron was placed between-decks is not satisfactorily described by any of the respondent's witnesses. The carpenter of the ship was examined shortly after her arrival, and he testified explicitly that this bin was formed of planks or boards, which he sawed at the request of the mate, and which were placed edgewise, one upon another, and resting against the bales stowed along the wings of the ship, and were not nailed or fastened together. A number of witnesses who had taken part in the loading of the vessel at Danzig were examined on commission some two years afterwards, some of whom state that these planks forming the bin "were made fast and stanchioned to the side of the ship." There is no explanation of the precise mode in which this was done, and it is so indefinite as not to be very intelligible, and would seem to be much less trustworthy than the statement of the carpenter given shortly after the ship's arrival.

It seems to me self-evident that if the scrap-iron was brought up to the beams, as the captain states, and from three to five feet above the level of the bales stowed on each side of it, the bin or trunk which

was designed to secure it would require not merely fastening, but bracing of the strongest kind, in order to prevent its breaking loose on a winter voyage across the Atlantic. The evidence leaves no doubt in my mind that if this bin, with the iron inside, was thus carried up from three to five feet above the bales, and was in some manner stanchioned to the sides of the ship, it was altogether destitute of adequate fastening and was insufficiently done, and that the ship is therefore liable for the injury caused by the iron breaking loose and becoming scattered over and tearing the bales.

There is some reason to doubt whether, in fact, the trunk or bin containing the scrap-iron came up to the upper beams, as is stated in some of the respondent's testimony; and whether the scrap-iron, after being filled into the trunk as high as the bales on each side, was not stowed directly on the top of the bales. The testimony of the carpenter that the planks were simply placed on each other edgewise against the bales, and about on a level with them, would well agree with this supposition; and his testimony showed no way in which the planks forming the bin could be kept in position above the bales. Moreover, shortly after the unlading commenced, one of the libelants, on visiting the ship and seeing the iron scattered over the top of the bales, inquired of the first mate how that happened; to which he answered, in substance, that petroleum barrels had been expected, but that to avoid being frozen in the vessel did not wait for them, and that the scrap-iron was, therefore, put on top of the rags, as they had no idea that the iron or anything could damage the rags; which would seem to indicate that he was not aware of any objection to putting scrap-iron directly upon the bales. The same mate received the cargo at Danzig, and in general attended to the stowage; and it appeared also from the evidence of the witnesses there that none of those who took part in stowing this cargo had ever stowed a cargo of rags and iron before, or were practically acquainted with the proper mode of stowage. It is not improbable, therefore, that a portion of this scrap-iron may have been originally stowed directly upon the rags.

The conversation of the mate, above quoted, was objected to by the respondents, on the ground that it was incompetent; but by long-settled usage the first mate is the officer of the ship whose special duty it is, and not the captain's, to supervise the receipt and loading, as well as the unlading of the cargo. He is the agent and representative of the owners of the ship in that special business. Upon the ordinary

rules of evidence, as respects dealings with agents, his statements, therefore, while that business was still pending, as in this case, in regard to the mode of stowage and the reasons for it, are as competent as those of the owners of the vessels themselves.   1 Greenl. Ev. § 416; Dana, Seaman's Friend, 141.

I have not, however, decided this branch of the case upon that ground, but upon the assumption that the iron when loaded was carried up in the bin to the upper beams, and not spread out upon the rags at all.   Not only the carpenter's testimony, but the weight of the other evidence, shows that the bin thus made was insecurely constructed, and that the vessel should, therefore, be held liable for the resulting damage.

The same must be said with regard to the dunnage along the side of the ship.   The testimony was contradictory in regard to the amount of dunnage used; but, whatever was the amount actually used, it appears, not only from the libelants' witnesses, but from several on the part of the respondents, that in many places which were examined or noticed, there was no dunnage standing along the side of the vessel when the ship arrived.   The dunnage used in the wings consisted of sticks of fire-wood or petroleum wood set up endwise. Where not seen, it is claimed that it had fallen down in the rough weather; but I do not find any satisfactory evidence of care taken to guard against this liability, or any proof that the dunnage along the sides of the ship was attempted to be fastened securely.   Engelke, one of the claimant's witnesses, says it was not fastened at all.   Mere general statements that the dunnage was well done, is of little value against proof of specific acts of neglect.   The omission to fasten the dunnage securely to prevent its falling in rough weather, was negligence which exposed the bales to contact with the sea-water along the sides of the ship as she rolled from side to side, and necessarily caused rotting in consequence, for which the ship should, therefore, be held liable.

A reference should be ordered to take proof of the damage arising through the contact of the bales with sea-water at the sides of the vessel, and also from the contact of the bales with the iron, and from iron rust, for which the libelants are entitled to judgment, with costs.

The injury from sea-water taken in through the water-way seams and falling upon the bales between the decks, for which the ship is not responsible, must have been no inconsiderable cause, and was probably the sole cause, of the rot among the bales between-decks.

The difficulty of distinguishing the amount of damage attributable to this cause alone is doubtless very great. The evidence already taken is not sufficient to determine it with any degree of accuracy. In the case of *The Shand,* 10 Ben. 294, the reference ordered as to the loss of sugar involved a similar inquiry as to the loss to be attributed to different causes, and led to a very long and expensive and a most laborious litigation on the part of all concerned, in the endeavor to arrive at an approximately correct division. (See report and opinion on the damages in that case, filed April 27, 1882, *ante,* 570.) Such an approximation, if possible, supersedes the rule adopted in *The Mary Belle Roberts,* 2 Sawy. 1–6, and *Snow* v. *Carruth,* 1 Spr. 324, 327, and renders the case of *The Atlee,* 12 FED. REP. 734, inapplicable. If the parties in this case should agree upon some division, such as, perhaps, one-third of the loss through leakage from the deck, that might not prove very far from the final result of a reference; and very great labor, annoyance, and expense would be avoided. These observations, are of course, without prejudice to the legal rights of the parties, and if no agreement be made, a reference must be had as above directed.